EDNA J. PIERCE, PETITIONER-RESPONDENT, v. JERSEY CENTRAL POWER AND LIGHT COMPANY, RESPONDENT-PROSECUTOR.

Submitted May 6, 1941—Decided July 25, 1941.

Before Justices BODINE, PERSKIE and PORTER.

For the prosecutor, *Autenrieth & Wortendyke* (*Reynier J. Wortendyke, Jr.*, of counsel).

For the respondent, *Quinn & Doremus* (*Vincent J. McCue*, of counsel).

The opinion of the court was delivered by

PERSKIE, J. The single question requiring decision, on the facts of this workmen's compensation case, is whether respondent's decedent died because of gas asphyxiation, as respondent claims, or because of a coronary thrombosis, as prosecutor claims.

Edgar Morris Pierce, the decedent, was a man of 50 years of age. He was employed as a gas fitter by the Jersey Central Power and Light Company, prosecutor here and respondent below. On December 2d, 1938, between 11:00 and 11:30 o'clock in the forenoon, while in the course of his employment, he donned a gas mask, and after a fellow workman assisted him in adjusting it, he entered a hole four feet square by three and one-half feet deep for the purpose of catching the thread of a new fitting on a gas main. According to the testimony of the fellow employee, the decedent came out of the hole in a minute or a minute and a half after he entered it. When he was about twenty feet from the hole, and without removing the mask, the employee testified that decedent said, "Everything is all right and the fitting is cut straight, too." Decedent then took off the mask and immediately reeled. He was pronounced dead at 12:50 P. M.

Respondent, petitioner below, filed a claim petition on January 7th, 1939, in which she stated that the "cause of death was asphyxiation by gas." Prosecutor answered that "no accident occurred"—and that death was due to "natural" and not to "traumatic causes" which "did not arise out of decedent's employment," that is, he died from heart disease. At the hearings, testimony was introduced by prosecutor to show that a blood clot was found in decedent's coronary artery during a post mortem autopsy. Prosecutor also introduced testimony to show that a specimen of blood taken from decedent at the autopsy contained less than the ordinary lethal dose of carbon monoxide.

The Workmen's Compensation Bureau found that the post mortem autopsy "revealed the presence of a thrombus and that a laboratory analysis of the blood taken from the decedent's body indicated a presence of carbon monoxide in a quantity too small to have possibly caused the death." Accordingly, an order was filed on July 12th, 1940, dismissing the claim petition. On appeal to the Monmouth County Court of Common Pleas, Judge Giordano, after reviewing and analyzing the testimony, concluded that the evidence "preponderates in favor of the conclusion that decedent met his death from carbon monoxide poisoning arising out of and in the course of his employment." Therefore, the order of the Bureau was reversed and compensation was awarded to respondent. On prosecutor's application the writ of *certiorari* was granted. It now becomes our duty to examine the evidence and to determine whether respondent has established, by a preponderance of probabilities, that the employment was one of the controlling causes without which the death would not have happened. *Gilbert* v. *Gilbert Machine Works, Inc.,* 122 *N. J. L.* 533; 6 *Atl. Rep.* (2d) 213; *Calicchio* v. *Jersey City Stock Yards Co.,* 125 *N. J. L.* 112; 14 *Atl. Rep.* (2d) 465. In our consideration of the facts which prosecutor has produced to sustain its defense, by which defense it seeks to avoid liability for a cause for which it is not responsible, we must bear in mind that the burden of proof is upon the prosecutor-employer—"to show such cause." *Atchinson* v. *Colgate & Co.,* 3 *N. J. Mis. R.* 451, 452; 128 *Atl. Rep.* 598; *affirmed,* 102 *N. J. L.* 425; 131 *Atl. Rep.* 921. We turn to the proofs.

' Dr. Pons, called by prosecutor, and Dr. Featherstone, director of prosecutor's medical department, were both present at the autopsy. Each testified that the clot was an ante mortem one. Dr. Pons, however, on cross-examination, pointed out that a post mortem clot "would be soft and * * * could be removed very easily without being attached to the blood vessel wall." He admitted, moreover, that the clot here in question was a "fresh clot," that it "was not organized" but was "soft and rubbery and reddish" and was "of very recent origin."

Although Dr. Hartman, the county physician, testified that the "cause of death was thrombosis of the descending left coronary artery," he also stated that the clot was a fresh one and that there were "no damaged muscles around where the clot showed." His inability to recall his discussion with the other doctors and his apparent lack of knowledge of the nature of blood clots—especially post mortem ones—tend to render his testimony of little probative value.

Dr. Morris A. Aaronson, a specialist in X-ray work, was called as a witness by respondent. He testified that approximately ten months prior to decedent's death he had taken an X-ray of him because of an automobile accident in which the deceased was involved. These X-rays indicated that the heart was apparently normal and that there was no undue sclerosis, callous or calcification. Additionally, he indicated that decedent probably did not die from thrombosis because "cases of coronary thrombosis are long standing progressive conditions, or may be, and I think just from the X-ray point of view there should be some signs of aortitis or widening of the arch of the aorta or some definite evidence of some kind of widening of the heart musculature, which certainly was not apparent at the time I took these X-rays." Dr. Pons, called by prosecutor, also testified that the first attack of coronary thrombosis is seldom fatal and that he found no evidence that decedent had suffered from more than this one alleged fatal attack.

Dr. McKelvie, called by respondent, testified that he had attended the autopsy, had seen the clot in question and had

concluded that the death of decedent had not been caused by "coronary acclusion." In answer to the question, "Do you know when the clot appeared?" he responded, "No, none of us knew * * * the only way we would know would be through a laboratory finding." Prosecutor, although it had the opportunity, did not see fit to make this laboratory finding.

The testimony of Dr. Aaronson and Dr. McKelvie, called by respondent, and the statements made by Dr. Pons, called by prosecutor, indicate that the prosecutor has not satisfied its burden of proof of showing, by a preponderance of probabilities, that decedent's death was caused by an ante mortem thrombosis.

Has the respondent, by competent proof, satisfied her burden of establishing, by a preponderance of probabilities, that decedent's death was caused by gas asphyxiation?

Dr. Boyd, the only attending physician, testified that when he arrived on the scene of the accident the color of decedent's skin was light pink, i. e., life like and "somewhat active and pink," which, it is conceded by prosecutor's doctors, is symptomatic of gas poisoning. Dr. Boyd administered strychnine and adrenalin and the artificial respiration, which had been begun before his arrival, was continued. It was he who pronounced decedent dead 50 minutes after his arrival. Because of "the history of the man coming out of the excavation and the color he presented, and the odor of the gas coming out of the excavation," Dr. Boyd concluded that "his death was the result of carbon monoxide poisoning."

The light pink color of the skin, the pink color of the brain, the fiery red color of the blood, muscles and intestines of decedent were admitted to have been present by all the doctors except, perhaps, by Dr. Featherstone and by Dr. Sayre. None of these doctors denied that these signs indicated death by gas asphyxiation. Indeed, prior to the discovery of the clot and the report that a specimen of blood, taken at the autopsy, contained only 5.94% of carbon monoxide, the aforementioned symptoms had led not only Dr. Boyd and Dr. McKelvie, witnesses for the respondent, but also prosecutor's witnesses, Drs. Edel, Pons and Hartman to conclude that decedent's death was caused by carbon monoxide.

True, Dr. Edel, called by prosecutor, testified that he found only 5.94% of carbon monoxide present in the blood of decedent at the time of the autopsy; and Dr. Gonzales, the chief medical examiner of the City of New York, called by respondent, testified that the "ordinary lethal dose of carbon monoxide is considered between 30 and 35% saturation." It is, however, equally true that the record clearly establishes that decedent's blood probably did contain a lethal dose of carbon monoxide at the time of his death; but that that concentration had probably been reduced before a sample thereof was taken for chemical analysis. To demonstrate, we turn to the proofs.

Dr. Edel pointed out that prior to death "oxygen will combine with the carbon monoxide and form carbon dioxide" which breaks down the gas and reduces the amount of carbon monoxide very quickly. Likewise, Dr. Gonzales testified that a combination of 95% oxygen and 5% carbon dioxide continually administered in a respirator to a living person would reduce a 35% concentration to less than a 10% concentration in 30 minutes. In the instant case, the evidence is clear that decedent collapsed between 11:00 and 11:30 A. M.; for 15 or 20 minutes after his collapse, he received artificial respiration and thereafter an inhalator (which supplies both oxygen and carbon dioxide) was applied and the artificial respiration continued until decedent was pronounced dead at 12:50 P. M., by a doctor who had attended him since 12:00 o'clock noon. In addition, Dr. Gonzales testified that "the cherry red color does not begin, in our observation and the observation of others, till about 20% concentration, and when there is cherry red color of the blood and the muscles the concentration should be at least more than 20%."

It would seem clear, therefore, that decedent's blood, having clearly assumed the cherry red color prior to death, must have contained more than 20% of carbon monoxide; and that before a specimen of blood was taken from his body for analysis, the amount of carbon monoxide therein had been substantially reduced during the period that elapsed from the time of his collapse until the time that the attending doctor pronounced him dead—a period of one and one-fifth hours

at least. This, considered in conjunction with the time and place of the collapse and all the other surrounding circumstances, clearly supports the conclusion that decedent did die from gas poisoning.

In light of all that has been said, we, therefore, hold that respondent has established, by the preponderance of probabilities, that death resulted from carbon monoxide poisoning, and that prosecutor has failed to satisfy the burden of proving its alleged defense of death from a coronary thrombosis.

Accordingly, the judgment appealed from is affirmed, and the writ is dismissed, with costs.